UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NEMS, PLLC, | ) | 3:21-CV-01169 (SVN) |
|     *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HARVARD PILGRIM HEALTH CARE | ) | |
| OF CONNECTICUT, INC. n/k/a | ) | June 29, 2023 |
| HARVARD PILGRIM HEALTH CARE, | ) | |
| INC., | ) | |
|     *Defendant*. | | |

## ORDER CERTIFYING QUESTIONS TO THE
## CONNECTICUT SUPREME COURT

Sarala V. Nagala, United States District Judge.

This case involves a dispute between a group of emergency room physicians, NEMS PLLC ("Plaintiff"),[1] and an insurer, Harvard Pilgrim Health Care of Connecticut Inc. n/k/a Harvard Pilgrim Health Care Inc., ("Defendant"), about whether Defendant's payments to Plaintiff for emergency medicine services they provided violate the Connecticut Surprise Billing Law, the Connecticut Unfair Insurance Practices Act ("CUIPA"), and the Connecticut Unfair Trade Practices Act ("CUTPA"). This Court previously granted in part and denied in part Defendant's motion to dismiss, and allowed Plaintiff's CUTPA claim based on the Surprise Billing Law and certain sections of CUIPA to proceed, while dismissing Plaintiff's standalone claim for a violation of the Surprise Billing Law. *See NEMS PLLC v. Harvard Pilgrim Health Care of Conn. Inc.*, 615 F. Supp. 3d 125 (D. Conn. 2022).

Presently pending before the Court are the parties' competing motions for summary judgment, ECF Nos. 66 and 67. The Court held oral argument on the motions on April 27, 2023.

---

[1] This action has been consolidated with *Northeast Emergency Medicine Specialists, LLC v. Harvard Pilgrim Health Care of Connecticut, Inc.*, 3:21-cv-01172-SVN, for all purposes. *See* ECF No. 23. For ease of reference, the Court will refer to NEMS PLLC as "Plaintiff" throughout this order.

The cross-motions for summary judgment present certain questions of Connecticut law that have never been examined by any state court in Connecticut, much less the Connecticut Supreme Court, and may have far-reaching consequences in both this, and future, litigations. For the reasons explained in detail below, the Court has determined that the most prudent course of action is for the Connecticut Supreme Court to consider the questions at issue in the first instance. Therefore, the Court respectfully certifies the questions described below.

## I. SURPRISE BILLING LAW[2]

### A. In-Network and Out-of-Network Providers and Payments

Health insurers often negotiate agreements with medical providers that set an "allowed amount" the provider is allowed to charge patients for a given treatment or service. Pl.'s Local Rule ("L.R.") 56(a)2 Statement ("St."), ECF No 78-1, ¶ 4; Stipulated Facts ("Stip."), ECF No. 96 ¶¶ 10, 38. Providers with such negotiated agreements are called "in-network" providers. Pl.'s L.R. 56(a)2 St. ¶ 4. Insurers will often negotiate different allowed amounts with different in-network providers. Stip. ¶ 41.

When a patient receives a medical service from an in-network provider, the provider bills for the allowed amount under the provider's agreement with the insurer. The insurer typically pays a portion of the provider's fee, and the patient pays what is known as a cost-share, which is typically made up of a deductible, copayment, or coinsurance. Stip. ¶¶ 10–13. The deductible is a dollar amount that must be satisfied by an insured each year before the insurance provider will begin to pay for any benefits. Pl.'s L.R. 56(a)2 St. ¶ 2. Once a patient has fully paid the

---

[2] Pursuant to Conn. Gen. Stat. § 51-199b(g) the Court solicited, and received, a statement of stipulated facts from the parties in this litigation. After reviewing this submission, however, the Court does not believe the stipulated facts adequately encompass all of the facts relevant to the present issue. Moreover, many of the facts contained in this purported stipulation were either not agreed to or, according to the parties, are relevant only in certain situations. Therefore, the facts contained in this order have been taken from the parties' stipulation of facts where possible, and are otherwise drawn from the parties' Local Rule 56(a)2 statements submitted in connection with the pending cross motions for summary judgment.

deductible for services in a year, he may also be required to pay other amounts such as a coinsurance (a percentage of the allowed amount charged by the provider) or a copayment (a set dollar amount toward the service). *Id.* ¶ 3; Stip. ¶ 39. Because these amounts can vary, patients will likely be responsible for paying different amounts out of pocket, depending on their insurance plan.

Where, however, a patient is treated by a provider that does not have an agreement with the patient's insurer, that provider is considered "out-of-network." When a provider is out-of-network, the provider can generally choose what it charges the patient for a given procedure or treatment. Pl.'s L.R. 56(a)2 St. ¶ 6. Whether a provider is in-network or out-of-network for a given patient can significantly increase or decrease the cost the insured is required to bear. This is because, generally, in addition to out-of-network providers having no pre-negotiated maximum allowed amount, in-network and out-of-network services have different benefit structures, with patients typically having to pay higher deductibles or coinsurance rates for out-of-network services. *Id.* ¶ 7.[3] Such differences may be set out in an insurance plan's schedule of benefits or benefits handbook, depending on the insurance plan. *Id.* ¶¶ 8, 9.

B. Connecticut's Surprise Billing Law

The Surprise Billing Law was enacted by the Connecticut Legislature in 2015. Generally, the parties agree that the Surprise Billing Law was passed in an effort to shield patients from being saddled with surprisingly high medical bills when they receive emergency medical treatment. In a medical emergency, the logic goes, a patient does not have time to examine which providers or facilities may be in-network or out-of-network; she simply goes to the place she can reach the quickest. The Surprise Billing Law is intended to prevent such a

---

[3] Although Plaintiff contends that the federal Affordable Care Act requires in-network and out-of-network benefits for *emergency medical services* to be identical, it appears not to dispute that, *generally*, in-network and out-of-network benefits might be different. Pl.'s L.R. 56(a)2 St. ¶ 7.

patient from being punished for making the expedient choice by having to pay a higher cost for the out-of-network provider's services than she would have had to pay for similar services rendered by an in-network provider. Plaintiff also contends that a second purpose of the Surprise Billing Law was to "ensure that emergency physicians are paid for out of network services at a specified rate." Second Am. Compl., ECF 45, ¶ 28.

Two provisions of the law are most relevant here. First, Section 38a-477aa(b)(2) provides:

> No health carrier shall impose, for emergency services rendered to an insured by an out-of-network health care provider, a coinsurance, copayment, deductible or other out-of-pocket expense that is greater than the coinsurance, copayment, deductible or other out-of-pocket expense that would be imposed if such emergency services were rendered by an in-network health care provider.

Second, Section 38a-47aa(b)(3)(A) states:

> If emergency services were rendered to an insured by an out-of-network health care provider, such health care provider may bill the health carrier directly and the health carrier shall reimburse such health care provider the greatest of the following amounts: (i) The amount the insured's health care plan would pay for such services if rendered by an in-network health care provider; (ii) the usual, customary and reasonable rate for such services; or (iii) the amount Medicare would reimburse for such services.

Separately, another provision of Connecticut law states that "[i]t shall be an unfair trade practice in violation of chapter 735a [CUPTA] for any health care provider to request payment from an enrollee, other than a coinsurance, copayment, deductible or other out-of-pocket expense, for . . . (2) emergency services . . . covered under a health care plan and rendered by an out-of-network health care provider, or (3) a surprise bill, as defined in section 38a-477aa." Conn. Gen. Stat. § 20-7f(b).

4

C. The Facts of This Dispute

Plaintiff is an LLC that employed emergency medicine physicians and supplied them to hospital emergency departments between 2018 and 2021. Stip. ¶ 1. During that timeframe, Defendant provided health insurance policies to Connecticut residents. *Id.* Plaintiff has not entered a provider agreement with Defendant, so Plaintiff's providers are out-of-network for Defendant's plan members. Stip. ¶ 3.

When Plaintiff's physicians provided health care services to patients insured by Defendant, Plaintiff would bill them through a third-party revenue management company. *Id.* ¶ 8. Upon receiving these bills, Defendant would determine what to pay providers using an automated process. *Id.* ¶ 9. This process would calculate the allowed amount for each service and calculate the fee that was due to the provider using the Fair Health Inc. database.[4] *Id.* ¶ 11. The automated process also calculated the patient's deductible, copayment, and coinsurance associated with the terms of his or her plan. *Id.* ¶ 12. Based on this information, Defendant then calculated the total amount owed by the patient as his or her cost-share. *Id.* ¶ 13.

In order to make this calculation, the Defendant applied its insureds' in-network deductible, copayment, and coinsurance rates, instead of the potentially higher out-of-network ones. *Id.* ¶ 14. Once these in-network rates were determined, Defendant sent "explanations of benefits," or EOBs, to Plaintiff's third-party revenue management company setting forth the amounts owed by patients and Defendant for the medical services Plaintiff provided. *Id.* ¶ 16.

---

[4] The parties agree that The Fair Health Inc. database is a catalog that contains a list of "the 80th percentile of all charges for the particular health care service performed by a health care provider in the same or similar specialty and provided in the same geographical area." Pl.'s L.R. 56(a)2 St. ¶ 16. The parties also agree that, under Connecticut law, this is the correct price to be charged for Plaintiff's services to Defendant's insureds, as it is generally the greatest of the three amounts listed in the Surprise Billing Law. As discussed below, the parties only disagree on who should be paying what portion of this cost.

5

Once this EOB was sent to the revenue management company, Plaintiff was responsible for collecting the patient's share of the bill directly from the patient. Def.'s L.R. 56(a)2 St. ¶ 7.

In 2018, Ventra Health took over as Plaintiff's revenue management company. Stip ¶ 8. Upon taking over, Ventra Health began analyzing the EOBs provided by Defendant and determined that the amounts being charged to the patients were unallowably high under the Connecticut Surprise Billing law, as described further below. Pl.'s L.R. 56(a)2 St. ¶ 28; Stip. ¶ 16. Having concluded that Defendant was not processing emergency bills in accordance with the Surprise Billing Law, Plaintiff believed it could not bill patients the full amounts Defendant claimed the patients owed, as doing so could be an unfair trade practice under Conn. Gen. Stat. § 20-7f(b), and instructed Ventra not to do so. Stip. ¶ 17; Def.'s L.R. 56(a)2 St ¶ 8. Defendant, believing that it had properly processed Plaintiff's bills in accordance with the Surprise Billing Law, refused to reimburse Plaintiff for the amounts Defendant claimed were owed by the patients. Plaintiff thus never received what it believed to be full reimbursement for the services rendered, and this lawsuit followed. The various interpretations of the Surprise Billing Law's provisions are discussed below.

## II. LEGAL STANDARD FOR CERTIFICATION

In the state of Connecticut, "the Supreme Court may answer a question of law certified to it by a court of the United States or by the highest court of another state or of a tribe, if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state." Conn. Gen. Stat. § 51-199b(d). In determining whether to certify a question to the Supreme Court, district courts in the District of Connecticut consider "(1) the absence of authoritative state court decisions; (2) the importance of the issue to the state; and (3) the capacity of certification to

resolve the litigation." *Cerame v. Lamont*, No. 3:21-CV-1508 (JCH), 2022 WL 2834632, at *2 (D. Conn. July 20, 2022), *certified question answered*, 346 Conn. 422 (2023).

Additionally, the Second Circuit has "long recognized that state courts should be accorded the first opportunity to decide significant issues of state law through the certification process, and that, especially where the issues implicate[ ] the weighing of policy concerns, principles of comity and federalism strongly support certification." *Munn v. Hotchkiss Sch.*, 795 F.3d 324, 334 (2d Cir. 2015), *certified question answered*, 165 A.3d 1167 (Conn. 2017). Moreover, "certification is especially important in categories of cases where, unless there is certification, the state courts are substantially deprived of the opportunity to define state law." *Gutierrez v. Smith*, 702 F.3d 103, 116 (2d Cir. 2012). This situation is more likely to arise "when the federal courts have diversity jurisdiction over most of the cases presenting certain state law questions, a situation which is not unlikely in insurance and corporate law." *Id*.

### III.   DISCUSSION

This case presents two almost completely separate, yet equally unsettled, areas of Connecticut law. The first, how to interpret the Surprise Billing Law and what the statute requires of both insurance providers and healthcare providers, has never been examined by any state court in Connecticut. The second is whether a party can maintain a CUTPA claim for violation of a statute that has not expressly been designated a violation of CUIPA, but that nevertheless regulates insurance conduct. The Court discusses each of these issues below, before arriving at the certified questions.

####    A.   The Surprise Billing Law

Throughout this litigation, three separate interpretations of the Surprise Billing Law have emerged regarding the manner in which the statute functions to limit patients' bills and

compensate emergency medical providers. In order to fully illustrate these differing interpretations, the Court will use a simple example. In this example, a patient insured by Defendant visits an emergency room during a medical emergency and receives a certain treatment from Plaintiff's physicians, who are out-of-network. The Fair Health Inc. database states that Plaintiff is entitled to charge $1,500 for those services. Despite this allowance, had the patient visited an in-network provider, these same services would have cost only $500. The patient has a $1,000 deductible for in-network services and a $5,000 deductible for out-of-network services. Plaintiff bills Defendant $1,500.

Under the interpretation of Section 38a-477aa(b)(2) originally advanced by Plaintiff, the patient could be responsible for paying only $500, which is the amount the treatment would have cost from an in-network provider. Defendant would be responsible for paying Plaintiff the remaining $1,000. This is regardless of the fact that each of the patient's deductibles (in-network or out-of-network) is higher than $500. In support of its interpretation, Plaintiff contends that the statute was intended to ensure that the patient is personally responsible for paying not one dollar more for out-of-network emergency services than she would have paid for the same in-network services. The difference, Plaintiff claims, should be paid by Defendant.

Conversely, under Defendant's interpretation of Section 38a-477aa(b)(2), and consistent with what Defendant actually did here, the patient would be responsible for her entire in-network deductible of $1,000, and Defendant would pay Plaintiff the remaining $500. In Defendant's view, the fact that the patient would actually pay more for the out-of-network visit ($1,000) than an in-network visit ($500) does not mean that Defendant's practice violates the statute. Rather, Defendant believes that, as long as it applies the in-network deductible, copayment, or coinsurance, it has complied with the Surprise Billing Law. *See* Conn. Gen. Stat. § 38a-

477aa(b)(2) ("No health carrier shall impose, for emergency services rendered to an insured by an out-of-network health provider . . . a coinsurance, copayment, deductible, or other out-of-pocket expense that is greater than the coinsurance, copayment, deductible or other out-of-pocket expense that would be imposed if such emergency services were rendered by an in-network health care provider").

In Defendant's scenario, Plaintiff is left to collect the $1,000 deductible from the patient. Plaintiff believes, however, that were it to attempt to collect the full $1,000 from the patient, this would constitute an unfair trade practice under Connecticut General Statute § 20-7f(b). Instead, Plaintiff believes it can seek only $500 from the patient, as that is the amount the patient actually would have paid at an in-network provider. Therefore, Plaintiff would be paid only $1,000 for the treatment rendered ($500 from Defendant and $500 from the patient) instead of the full $1,500 it is indisputably allowed to charge. Plaintiff alleges that this type of underpayment occurred repeatedly between 2018 and 2021, and is the basis of its alleged damages in this suit.

In addition to these two interpretations, at oral argument the Court posited a possible third reading not previously raised by either party, relying on Conn. Gen. Stat. § 38a-477aa(3)(A), rather than § 38a-477aa(2). Subsection 3(A) of the Surprise Billing Law states: if emergency services are rendered by an out-of-network provider, "such health care provider may bill the health carrier directly and the health carrier *shall reimburse* such health care provider" the greatest of three amounts. Conn. Gen. Stat. § 38a-477aa(3)(A) (emphasis added). Under the third reading, in the hypothetical scenario, Plaintiff would bill Defendant $1,500 and Defendant would immediately pay Plaintiff the full amount of $1,500. *Defendant*, rather than Plaintiff, would then be responsible for seeking payment from its insured for an amount up to the in-network coinsurance, copayment, or deductible. Although Plaintiff initially disclaimed this

interpretation of the law at oral argument, it now argues this third reading is correct. *See* ECF No. 87.

*1. Discussion*

As noted above, there are three possible interpretations of the relevant language of the Surprise Billing Law. The facts about how Defendant processed Plaintiff's claims are not in dispute; the central issue is whether Defendant's interpretation of the statute is correct and complies with the Surprise Billing Law, or whether one of the other two interpretations is correct. It is therefore clear that the interpretation of the statute "may be determinative of an issue in pending litigation in the certifying court." Conn. Gen. Stat. § 51-199b(d). Further, the parties agree that there is no Connecticut Appellate or Supreme Court decision determining this issue, and the Court has been unable to locate even a single Connecticut Superior Court ruling interpreting the Surprise Billing Law. Thus, the Court is satisfied that under Connecticut General Statute § 51-199b(d), this issue is one that is eligible to be certified to the Connecticut Supreme Court.

Even if the answer to a question of law may be determinative of an issue and there is no controlling state appellate authority, the Court must further consider "(1) the absence of authoritative state court decisions; (2) the importance of the issue to the state; and (3) the capacity of certification to resolve the litigation" in deciding whether to certify questions. *Cerame*, 2022 WL 2834632, at *2. First, the Court has already noted that there is no authoritative state court decision on the issue of how to interpret the Surprise Billing Law. In addition, the legislative history concerning the Surprise Billing Law is quite sparse. Thus, the first factor counsels in favor of certification.

Turning to the second factor, it is clear that this question is of great importance to the state. In their supplemental briefing, Defendant argues that were the Court to interpret the Surprise Billing Law consistent with the third proposed interpretation above, it would "upend the operation of insurance" in the state of Connecticut because insurers have never been required to pay the entire provider bill upfront and then seek to recover the patient's cost-share later. ECF No. 86 at 7. Even Plaintiff, when first asked about the third possible interpretation at oral argument, stated that such an interpretation "would be a revolution in the way insurance claims are processed." Oral Arg. Tr., ECF No. 85 at 24:13–14. *See also id.* at 23:22–25 ("We would obviously love it if Harvard Pilgrim would pay the cost share and then, you know, get that money from the patient, but it just doesn't operate like that anywhere."). Thus, while it appears to the Court the third reading is the most straightforward way to interpret the plain language of the Surprise Billing Law,[5] both parties agree that such a reading would have a dramatic and far-reaching effect on the insurance industry in Connecticut. Therefore, it is clear the second factor weighs in favor of certification. *See Munn*, 795 F.3d at 334 (explaining that certification is proper "especially where the issues implicate[ ] the weighing of policy concerns, principles of comity and federalism strongly support certification.").

As to the third consideration, the Court believes that answers to the certified questions could resolve this litigation. The facts are essentially undisputed, and the question of law—how Sections 38a-477aa(b)(2) and (3)(A) should be interpreted—will be fully determinative of

---

[5] The Court notes that the section of the Affordable Care Act addressing surprise medical emergency services bills specifically provides that the insurer must pay the provider the amount "by which the out-of-network rate . . . for such services *exceeds the cost-sharing amount for such services*." 42 U.S.C. § 300gg-111(a)(1)(C)(iv)(II) (emphasis added). The Affordable Care Act, then, specifically contemplates that the insurer would pay the provider only the amount above the patient's cost-share. Connecticut's Surprise Billing Law contains no such provision; rather, it mandates the insurer to reimburse the provider the greatest amount of the three possible calculations, without any reference to reimbursing only the amount that exceeds the patient's cost-share. *See* Conn. Gen. Stat. § 38a-477aa(3)(A).

11

whether Defendant violated the Surprise Billing Law. Thus, the final factor also counsels in favor of certification.

In addition to each of these factors favoring certification, this is, of course, an action involving insurance. The Second Circuit has specifically recognized this area of law as one that often results in repeated litigation in federal court without state court litigation to allow the state's courts to interpret its own law. *See Gutierrez,* 702 F.3d at 116. Therefore, despite the delay inherent in the process of requesting certification, the Court believes that the most prudent course of action in this litigation is to provide the Connecticut Supreme Court the first opportunity to interpret the Surprise Billing Law.

### B. CUTPA Cause of Action

#### *1. Background*

In its ruling on the Defendant's motion to dismiss, this Court has already determined that the Surprise Billing Law does not allow for a private cause of action. *See* ECF No. 49.[6] The Court further determined, however, that for purposes of a motion to dismiss, a purported violation of the Surprise Billing Law sufficed to state a claim under CUTPA, independent of CUIPA. Now, the Court finds itself faced with determining, for purposes of summary judgment, whether a violation of the Surprise Billing Law, a statute that regulates insurance related conduct, can form the basis of a CUTPA claim. Despite having previously held that the Plaintiff be permitted to proceed past the motion to dismiss, state law is unsettled as to whether, if

---

[6] While this, too, was a question of first impression when presented on the motion to dismiss, the Court felt that, unlike with the current issues, there was enough guidance available to it under existing Connecticut law that it was appropriate for the Court to "predict how the highest court of the state . . . would resolve the uncertainty or ambiguity." *First Invs. Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 165 (2d Cir. 1998). Should the Connecticut Supreme Court accept the questions certified in this order, and elect to reexamine this holding as well, the Court would welcome its input on this determination.

Plaintiff proves a violation of the Surprise Billing Law, it has also established a standalone CUTPA violation.

*2. Discussion*

The seminal case in Connecticut on whether a plaintiff can maintain an insurance-related CUTPA claim independent of CUIPA is *State v. Acordia, Inc.*, 73 A.3d 711, 732 (Conn. 2013). In *Acordia*, the Connecticut Supreme Court confronted the question of whether a common law claim, specifically an alleged breach of fiduciary duty by an insurance broker, could form the basis of a CUIPA violation. *Id.* at 720. The court also addressed whether a CUTPA claim could survive if the underlying CUIPA claim on which the CUTPA claim was based did not. *Id.* at 720.

On the first issue, the court noted that CUIPA provides an itemized list of insurance practices that are prohibited. *Id.* at 723. Where a statute contains such a list, the Legislature is presumed to have intended that list to be exclusive, unless there is evidence to the contrary. *Id.* at 724. The court then noted, however, that CUIPA does not expressly provide that the list is exclusive, and that Conn. Gen. Stat. § 38a-815 allows the Insurance Commissioner to determine that "a particular practice constitutes an unfair insurance practice in violation of CUIPA." *Id.* Nevertheless, the court reasoned that, "because there is no statutory basis for concluding that breach of fiduciary duty constitutes a violation of CUIPA, . . . the trial court improperly incorporated this common-law concept into its CUIPA analysis." *Id.* at 726. Because the CUIPA claim based on the alleged breach of fiduciary duty failed, the accompanying CUTPA claim failed as well. *Id.* at 729.

While *Acordia* definitively foreclosed a CUTPA action for insurance-related conduct based on a common law right, the decision reserved the possibility that a CUTPA action for

13

insurance-related conduct could be based on either a violation of CUIPA or, "arguably, some other statute regulating a specific type of insurance related conduct." *Id.* at 732. Since the *Acordia* decision, however, the Connecticut Supreme Court has not directly expounded on whether or when a CUTPA action can be brought pursuant to another "statute regulating a specific type of insurance related conduct." *Id.*

The closest the Connecticut Supreme Court has come was *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, 119 A.3d 1139 (Conn. 2015). There, the plaintiffs brought a class action, claiming that an insurer violated CUTPA by requiring its appraisers to use hourly labor rates agreed upon by the insurer and the auto body shop, rather than rates that more accurately reflected the value of the labor, when appraising auto body damage sustained by insureds. *Id.* at 1140. This alleged conduct did not violate any specified CUIPA provisions, but allegedly violated Conn. Gen. Stat. § 38a-790-8, pertaining to appraisers evaluating damaged property fairly and impartially. *Id* at 1151. In *Artie's*, the court held that "although § 38a-790-8 reasonably may be characterized as regulating insurance related conduct insofar as it prescribes a standard of conduct for appraisers who estimate the cost to insurers of auto body repairs," that provision did not regulate the conduct at issue because the labor rate an auto body shop would be paid was the subject of negotiation between the insurer and the shop, and did not run afoul of the ethical duties of appraisers set forth in the statute. *Id.* at 1151–52. Thus, the court had no reason to, and did not, reach the question of whether a CUTPA claim could be premised on a violation of § 38a-790-8.

With this guidance in mind, the Court turns to whether it is appropriate to request assistance from the Connecticut Supreme Court. Initially, the determination of this issue is determinative of an issue in the instant litigation as, if Plaintiff cannot maintain an action for

insurance related conduct under CUTPA independent of CUIPA, much of Plaintiff's case must be dismissed. Further, the only available authority to the Court has been discussed above. The Connecticut Supreme Court has not clarified whether, and in what circumstances, an action such as this can be maintained.[7] Therefore, Connecticut General Statute § 51-199b(d) is satisfied.

As for the three additional factors, once again the first and third factors counsel in favor of certification. There is insufficient state authority on this issue, and the resolution of this issue will have a significant, possibly determinative, effect on the instant litigation.

The second factor—the importance of the issue to the state—also favors certification. As articulated in *Acordia*, the Connecticut legislature was exceedingly particular in drafting CUIPA. The list provided therein was quite specific and the Connecticut Supreme Court noted that unless otherwise stated, such lists are presumed to be exclusive. *Acordia*, 73 A.3d at 724. While the Connecticut Supreme Court left open the possibility that other laws regulating insurance could potentially form the basis of a CUTPA claim, definitively allowing such a claim would be a significant change in the law of the state. This is especially true in light of the conflicting decisions surrounding this issue at the Connecticut trial court level. *Compare Chi. Title Ins. Co. v. LaPuma*, No. AANCV156018031S, 2016 WL 5339456, at *6 (Conn. Super. Ct. Aug. 23, 2016) (holding a CUTPA claim cannot be premised on a violation of a statute regulating insurance related conduct), *with Blakeslee Arpaia Chapman, Inc. v. Kiewit Infrastructure Co.*, No. KNL-CV22-6059097S, 2023 WL 2662022, at *2 (Conn. Super. Ct. Mar. 24, 2023) (noting that a number of Connecticut trial courts have held that violation of an insurance related statute

---

[7] When confronted with an alleged standalone violation of CUTPA based on violations of the Surprise Billing Law, another District Judge in the District of Connecticut recently allowed such a claim to proceed, finding support in *Acordia*, *Artie's*, and this Court's decision on the motion to dismiss in the present litigation. *See Murphy Med. Assocs., LLC v. Cigna Health & Life Ins. Co.*, No. 3:20-CV-1675 (JBA), 2023 WL 3434988, at *6 (D. Conn. May 12, 2023). It is thus clear that the issues raised in this litigation are percolating in federal court, without additional guidance from Connecticut appellate courts.

can form the basis of a CUTPA claim independent of CUIPA).  Thus, regardless of whether this Court were to allow, or not allow, the instant action, such a decision would likely have significant effects on litigation surrounding laws regulating insurance in Connecticut.  Such a decision is more properly issued by the Connecticut Supreme Court, after an appropriate weighing of the issues involved.  Thus, the second factor also favors certification.

As each of the three factors favor certification of this issue, the Court will certify this question to the Connecticut Supreme Court as well.

### IV. QUESTIONS FOR CERTIFICATION

In light of the fact that the answers may be determinative of the instant litigation, and there is no controlling appellate decision, constitutional provision, or statute resolving the issues, the following questions are certified to the Connecticut Supreme Court:[8]

1. Does Connecticut's Surprise Billing Law, Conn. Gen. Stat. Section 38a-477aa(3)(A), which provides that, "[i]f emergency services were rendered to an insured by an out-of-network health care provider, such health care provider may bill the health carrier directly and the health carrier shall reimburse such health care provider the greatest" of three amounts, require a health carrier to fully reimburse an out-of-network health care provider at the greatest of the three amounts for emergency services rendered to its insureds, and then later recover any applicable deductible, copayment, or coinsurance directly from the insured?

2. If not, is Defendant's practice of paying Plaintiff only that amount that exceeds the insured's in-network deductible, copayment, or coinsurance, and leaving Plaintiff to recover the remaining amount directly from the insured, regardless of whether such remaining amount is greater than the amount the insured would have been personally responsible to pay had they visited an in-network provider, a violation of the Surprise Billing Law?

3. Under any interpretation of the Surprise Billing Law, can a plaintiff successfully maintain an action under CUTPA, for actions that do not violate CUIPA, but purport to violate the Surprise Billing Law, because the Surprise Billing Law regulates a specific type of insurance related conduct, under *State v. Acordia*, 73 A.3d 711, 732 (Conn. 2013)?

---

[8] Pursuant to Connecticut General Statute § 51-199b(f), the Connecticut Supreme Court is free to reformulate any of the certified questions if it so desires.

## V.    NAMES AND ADDRESSES

Pursuant to Connecticut General Statues § 51-199b(f)(4), this Court is required to provide the names and addresses of counsel of record.  Plaintiff is represented by:

Kristen Zaehringer
Hurwitz Sagarin Slossberg & Knuff, LLC
147 Broad Street
Milford, CT 06460
203-877-8000
Email: KZaehringer@hssklaw.com

Simon Irving Allentuch
90 Edgewood Way
New Haven, CT 06515
203-435-2467
Email: sallentuch@nemsed.com

Timothy Cowan
Hurwitz Sagarin Slossberg & Knuff, LLC
147 North Broad Street
Milford, CT 06460
203-877-8000
Email: tcowan@hssklaw.com

Defendant is represented by:

Elizabeth P. Retersdorf
Day Pitney LLP
242 Trumbull St.
Hartford, CT 06103-1212
860-275-0100
Fax: 860-275-0343
Email: eretersdorf@daypitney.com

Jeffrey Mueller
Day Pitney LLP
242 Trumbull St.
Hartford, CT 06103-1212
860-275-0164
Email: jmueller@daypitney.com

## VI. CONCLUSION

For the reasons discussed herein, the Court certifies the above questions to the Supreme Court of Connecticut.

**SO ORDERED** at Hartford, Connecticut, this 29th day of June, 2023.

                                               */s/ Sarala V. Nagala*
                                               SARALA V. NAGALA
                                               UNITED STATES DISTRICT JUDGE